# IN THE UNITED STATES BANKRUPTCY
# COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| ANN MILLER | : |
| DEBTOR | : BANKRUPTCY NO.  12-16015 SR |
| | |
| JOAN ZUBRAS | : |
| | : |
| PLAINTIFF | : |
| VS. | : |
| ANN MILLER | : |
| DEFENDANT | : ADVS. NO.  15-231 SR |

# OPINION

BY:  STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

## *Introduction*

Before the Court is an Adversary Proceeding wherein the Plaintiff, Joan Zubras, ("Plaintiff" or "Zubras") requests 1) that the Chapter 7 Bankruptcy discharge of the Debtor/Defendant, Ann Miller ("Debtor" or "Miller") be revoked, 2) that the Debtor be denied any discharge at all or, 3) in the alternative, that the Plaintiff's claim against the Debtor be excepted from any discharge the Debtor receives. The Plaintiff also seeks an award of attorney's fees.

An Answer in opposition to all relief sought was filed and trial was held August 31, 2016.[1]

---

[1] Because these matters involve administration of the estate, a request for a determination of dischargeability, and denial of discharge, they are within this Court's "core" jurisdiction. *See* 28 U.S.C. § 157(b)(2)(A), (I), and (J) (including among core proceedings such causes of action)

For the reasons which follow, partial judgment will be entered in favor of the Plaintiff and against the Debtor. The Discharge entered in this case on October 12, 2012 will be revoked and the Debtor will be denied a Chapter 7 Discharge. This disposition will render moot Plaintiff's request to have her claim excepted from discharge under 11 U.S.C. § 523. Lastly, Plaintiff's request for an award of attorney's fees in connection with this matter will be denied.[2]

### Background

By any measure this has been a very contentious litigation. Although the adversary proceeding was filed on June 22, 2015, its procedural history actually extends back over 4 years. The history has taken a circuitous path, but that itself is of significance to matters before the Court. Accordingly, a detailed recounting of the case history is necessary.

The Chapter 7 Bankruptcy case was filed on June 23, 2012. On June 25, 2012 Gary F. Seitz was appointed Chapter 7 Trustee. The Debtor is an attorney. At the time the Debtor filed her case she had been a member of the Bar of the Commonwealth of Pennsylvania for over 35 years. Her practice at the time included, to some extent, the representation of Plaintiffs in class action litigations. Her usual and customary rate for such work was $650 per hour. *See* Trial Ex. P-4.

The Debtor filed various documents required in connection with her case on July 16-17, 2012. Docket ## 22-27. Included among these were Bankruptcy Schedules A

---

[2] Attorney's fees may be recovered in actions based on federal bankruptcy statutes only when the statute so provides, regardless of whether there is a contract providing for attorney's fees. *See In re McDonald*, 177 B.R. 212, 218 (Bankr.E.D.Pa. 1994) (holding that a *creditor* relying on § 523(a)(2), and prevailing under that provision is not entitled to attorney's fees); *see also, Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975) (award of attorney's fees in federal litigation reversed as contrary to the "American Rule").

through J, a Statement of Financial Affairs, (SoFA), and a Chapter 7 Statement of

Current Monthly Income with Means Test Calculation. As required, these documents

were signed by the Debtor who attested, under penalty of perjury, that the information

contained in the documents was true and correct.

The § 341(a) Meeting of Creditors was held and concluded on August 1, 2012.

The Chapter 7 Trustee filed a Report of No Assets the same day. As noted, a Discharge

Order was entered on October 12, 2012. An Order approving the Trustee's Report,

Discharging the Trustee, and Closing the Case was entered on January 1, 2014.

On March 4, 2015 the Plaintiff filed a Motion to Reopen the Bankruptcy case. In it

the Plaintiff asserted that she was a prepetition creditor of the Debtor but had not been

listed in the Debtor's bankruptcy schedules. The Plaintiff alleged that she had no

contemporaneous knowledge of the case when it was pending and had received no

notice of it. The Plaintiff stated that it was only when she sued the Debtor for collection

of sums owed to her (Philadelphia Court of Common Pleas – Sept. Term 2014

No. 002835) that she first learned of the Debtor's 2012 bankruptcy. In addition to

claiming that the Debtor owed her money, the Plaintiff also asserted that in her

bankruptcy the Debtor had failed to report income from certain work she had performed

for SEPTA, and that she had failed to disclose active class action litigations wherein she

was a counsel of record, with an interest in counsel fees, some of which she later

collected.

The Debtor's initial response to the Plaintiff's Motion to Reopen was to file

another bankruptcy case. Specifically, on March 24, 2015, the Debtor commenced a

Chapter 13 case. Case No. 15-12000. The new case was originally assigned at random

to Chief Bankruptcy Judge Frank. It was reassigned to the undersigned the following

day in accordance with the Court's customary practice of reassigning a repeat filer's

new case to the presiding judge of a former case. Irrespective, on March 25, 2015, a

notice was also electronically sent to the Debtor's former Chapter 7 counsel, now also

her Chapter 13 counsel, Douglas Lally, Esquire, advising him that his client was

ineligible for a discharge.[3] No further actions to prosecute the Chapter 13 case were

taken and the case was dismissed on April 14, 2015 for failure to file the required

supporting bankruptcy documents. The Chapter 13 case was closed on April 29, 2015.

During the short time the Chapter 13 case was pending, Debtor's counsel filed a

"Suggestion of Bankruptcy" in the Debtor's Reopened Chapter 7 case. The Suggestion

of Bankruptcy slightly delayed action on the Plaintiff's Motion to Reopen the 2012 case.

After dismissal of the Chapter 13 case, however, the Debtor filed a response in

opposition to the Motion to Reopen and on May 13, 2015 a hearing was held.

The Debtor's response to the Motion to Reopen her 2012 case took pettifoggery

to a level the Court has seldom seen. In her response, the Debtor first creates the

impression that she doesn't know who the Plaintiff is, that she does not and never did

owe her any money, and that she was never sued by her for non-payment; all along

demanding "strict proof" of such allegations. In an abrupt turnabout, the Debtor then

acknowledges, albeit without explanation, that she does indeed know the Plaintiff, and

that she was in fact sued by the Plaintiff in the Philadelphia Court of Common Pleas for

---

[3] A Debtor is ineligible for a Chapter 13 discharge if the Debtor received a Chapter 7 Discharge within 4 years of the date the Chapter 13 case is filed. *See* 11 U.S.C. § 1328(f)(1). This stricture applied to the Debtor's Chapter 13 case. (Chapter 7 Discharge October 12, 2012 – Chapter 13 case filed March 24, 2015)

monies owed. Readers are left to discern for themselves that these seemingly
inconsistent positions were attributable entirely to Debtor's counsel seizing upon the fact
that Plaintiff's counsel had misspelled the Plaintiff's last name in the Motion to Reopen.
Instead of "Zubras" the Plaintiff's name was spelled "Zubrus." Regrettably, counsel's
resort to sophistry was a common tactic employed by him in this case.

In any event, Debtor's counsel asserted that the foregoing actually undercut the
Plaintiff's claim that she had no notice of the 2012 bankruptcy prior to February 2015, as
she claimed, because, says Debtor's counsel, he personally gave telephonic and email
notice of the 2012 bankruptcy case to the Plaintiff's State Court counsel, Howard
Trubman, Esquire on January 27, 2015. In support, counsel attached an email he sent
to attorney Trubman. *See* Resp. to Mot. to Reopen Ex. 1 – email from **Douglas Lally**
(*lawshark@hotmail.com*) to htrubman**@**gmail**.**com (*htrubman@gmail.com).*

The Court notes, parenthetically, that January 27, 2015 is actually quite close in
time to February 2015, making the probative weight of the January 27, 2015 email for
the purpose it was being offered negligible. The January 27, 2015 email is nevertheless
illuminating inasmuch as it 1) expressly confirmed that the Plaintiff was not listed as a
creditor in the 2012 case; 2) implicitly acknowledged a pre-petition indebtedness by
arguing that the 2012 case operated to discharge any such debt because of its "no-
asset Chapter 7" character, and 3) because it contained the Debtor's offer to "fully settle
the matter with Joan for the total of all money loaned on or after the bankruptcy filing
date of June 23, 2012."

In her Response the Debtor added that it was inconceivable that the Plaintiff did
not know of the 2012 bankruptcy filing, because it was the Plaintiff herself who first

suggested that the Debtor consider filing bankruptcy and who recommended that she consult with Attorney Lally.

As to the non-disclosure issues, the Debtor admitted that she began working as an independent contractor at SEPTA prior to filing her 2012 bankruptcy case, and that she worked approximately 20 hours per week at the rate of $100 per hour. The Debtor maintained, however, that this income was reflected on the Current Monthly Income Schedule of her 2012 case because the information listed there was her net income after expenses. Factoring in everything, the Debtor claimed that her adjusted gross income for all of 2012 was just $7,884.

Finally, the Debtor admitted that she had received payment on some of the active class action cases she had on the date of the filing of the 2012 bankruptcy case. The Debtor insisted however that this was completely irrelevant. Her contingent client class action cases, she claimed, "did not need to be brought to the attention of the Bankruptcy Court . . . . because they were fully disclosed by the Debtor to the Trustee at her meeting of creditors . . ." *See* Resp. at ¶ 16. Moreover, she asserted that the cases were not required to be reported on her bankruptcy schedules at all because they were "simply not part of the bankruptcy estate." In support of the former assertion the Debtor attached a partial transcript of the creditors meeting. *See* Resp. Ex. 2. In support of the latter assertion the Debtor citied no authority.

For these various reasons the Debtor argued that any objection to her discharge would be frivolous, and that the Court should deny the Motion to Reopen her case. The Court was unpersuaded. Following the hearing held May 13, 2015, and for the reasons

placed on the record in open Court at that time, the Court entered an Order (dated and docketed May 14, 2015) reopening the Debtor's 2012 bankruptcy case. Docket #54.

On May 14, 2015, the Debtor filed an amendment to her original Bankruptcy Schedule F – Creditors Holding Unsecured Non-Priority Claims. On it she listed the Plaintiff as holding a disputed claim for $50,000 based on alleged personal loans from the Plaintiff to the Debtor during the period 2010 – 2012. The Debtor also made mention of the related lawsuit pending in the Philadelphia Court of Common Pleas.[4]

The original Chapter 7 Trustee, Gary Seitz, Esq., was reappointed Trustee. On June 11, 2015 Seitz filed a Notice with the Bankruptcy Court Clerk requesting that the Debtor's case be changed from a "no-asset" to an "asset" case and that a bar date for the filing of claims against the estate be fixed. The Bankruptcy Court Clerk complied and set September 14, 2015 as the Claims Bar Date. Docket ## 58-59.

Debtor's counsel reacted to this by filing a document styled "Contra position Statement of the Debtor, Ann Miller, Regarding the Notice of the Trustee, Gary F. Seitz, Esq., of change from no asset to asset case dated June 12, 2015." This unusual pleading is addressed to Frederick J. Baker, Senior Assistant United States Trustee. In it the Debtor "gives notice" that she objects to the case being classified as an asset case.

As in so many other instances, Debtor's counsel here again resorted to pedantics. The Debtor's objection to the change notice was based on typographical errors. The first relates to the Trustee's use of the phrase "after due injury" instead of

---

[4] The Debtor had filed an Answer and New Matter in the State Court litigation on February 22, 2015, but followed that with a Praecipe on May 14, 2015 asking to have the cased deferred due to the now reopened 2012 bankruptcy case. The State Court litigation was stayed on June 22, 2015.

inquiry in the Change Notice he filed. (emphasis added) The second related to the bar

Date Notice from the Bankruptcy Court containing the term "recovered" assets, as

opposed to "discovered" assets, which was the term used in the Trustee's Notice.

(emphasis added) Neither the Office of the United States Trustee, nor the Bankruptcy

Court Clerk took any action with regard to the Debtor's Notice/Objection. In the Opinion

of the Court this was properly so, as it had no relevance and required no action by

anyone.

On June 22, 2015, the Plaintiff commenced the instant adversary proceeding.

The Plaintiff's Complaint largely tracked her Motion to Reopen the 2012

bankruptcy case. In this regard, the Plaintiff alleged:

I.   That she had loaned the Debtor monies before and after the 2012 case
     was filed, the total of which with interest was over $42,000;

II.  That she had no Notice or Knowledge of the 2012 case, adding A) that the
     Debtor had told the Plaintiff that she, the Debtor, did not want to file
     bankruptcy and B) that she, the Plaintiff, only first learned of the 2012
     case in February, 2015 from counsel representing her in the State Court
     collection action;

III. That the Debtor had failed to disclose her full income in the 2012
     bankruptcy case; and

IV.  That the Debtor had concealed and failed to disclose assets in the 2012
     case, including her interest in class action litigation referral fees, various
     items of personal property, and an interest in her late mother's estate.

On these bases the Plaintiff requested that the Debtor's 2012 discharge be

revoked, that she be denied a discharge entirely,or that the Plaintiff's claim be excepted

from the Debtor's discharge.

On July 23, 2015 the Debtor filed a verified Answer to the Plaintiff's Complaint. As with the Plaintiff, the Debtor's pleading largely tracked her response to the Motion to Reopen her 2012 case.

The Debtor acknowledged that she had not listed Zubras as a creditor in her 2012 case, but stated that her decision not to include her was an intentional one. She averred that she did not schedule Zubras as a creditor because she was afraid of her. In this regard the Debtor, at ¶ 8 of her Answer, sets forth a lengthy narration of an allegedly "terrifying experience" with Zubras, beginning in 2011 and continuing to some unspecified date after she filed her 2012 bankruptcy case. The Debtor describes Zubras as having waged a campaign of abuse and harassment to intimidate her not to file bankruptcy, and states that she was "afraid of Zubras' demonstrated lack of self-control and beyond irrational behavior." *Id.*

The Debtor also reasserted her position that there were no undisclosed assets or unreported income in her 2012 bankruptcy case. In this regard, the Debtor specifically maintained that she "made full and complete disclosure of her net income on her petition" and that she "had concealed no property period." Answer ¶¶ 26, 28.

With respect to her contingent class action cases the Debtor reiterated her position that the cases were not required to be listed in her bankruptcy schedules because they were not part of the bankruptcy estate. Furthermore, the Debtor took issue with the description of her monetary interest in the cases as representing "referral fees," denying that there were any referral fees due her on any class action case, for any reason, when she filed her 2012 bankruptcy case. *Id.* (emphasis added) She reiterated that the cases were nevertheless "fully discussed and disclosed" at the

meeting of creditors and added that the Chapter 7 Trustee agreed with her that the cases were not part of the bankruptcy estate. Answer ¶¶ 22, 23.

In her Answer, the Debtor stated that she did not know what was motivating the unusual conduct of the Plaintiff, and added that no one could possibly succeed in challenging her entitlement to a Chapter 7 discharge. The Debtor characterized the Plaintiff's challenge as frivolous and ended by asking that it be denied in its entirety. Answer ¶¶ 14, 38.

On October 21, 2015, the Debtor filed a Motion for Summary Judgment and asked that the adversary proceeding be dismissed. In her Motion the Debtor asserted that her case had been reopened only because the Plaintiff, who admittedly had not been listed as a creditor, insisted that the Debtor's 2012 discharge did not apply to her, and because the Plaintiff incorrectly claimed that alleged assets, consisting of the Debtor's class action cases, had not been scheduled. No mention of any other issues raised in the Plaintiff's Complaint was made.

In support of her Motion the Debtor argued that she had filed an amended Schedule of Unsecured Creditors to include the Plaintiff, that the Plaintiff had filed a Proof of Claim, and that the Plaintiff had accordingly suffered no harm. In this regard the Debtor again pointed to the fact that her 2012 bankruptcy had been classified as a no-asset case and that to date no distribution had been made to anyone. The Debtor argued that the plaintiff was in the same position as if she had originally been included as a creditor, since she would share in a distribution of assets should there ever be one. In a supporting Memorandum of Law, the Debtor described the situation thusly: "there is no financial harm to Joan Zubras and so no foul . . ."

The Plaintiff filed a response to the Summary Judgment Motion in which she stated that she had continued to loan money to the Debtor after she filed bankruptcy in 2012, something she stated she would not have done had she known about the bankruptcy case. Further the Plaintiff stressed that had she known about the case at the time, she could have attended the § 341 meeting of creditors and informed the Trustee of assets the Debtor had not disclosed. The Plaintiff included as affirmative defenses the following assertions:

> 9. Debtor failed to inform this court and the Chapter 7 trustee she received a referral fee of $21,171.00 a few days prior to the § 341 Meeting.

> 10. Debtor failed to inform this court and the Chapter 7 Trustee that she was a contract attorney for SEPTA, which started prior to her filing for bankruptcy, and was receiving approximately $2,000.00 per week.

> 11. Debtor has failed to inform this court and the Chapter 7 Trustee she was entitled to referral fees in five cases from Berger and Montague and these cases were referred prior to her filing of the bankruptcy.

> 12. Debtor has failed to inform this court and the Chapter 7 Trustee she was entitled to receive at the time she filed bankruptcy and did receive a referral fee of $23,423.00 from Berger & Montague in July, 2014.

> 13. Debtor has failed to amend her Schedule B to disclose the above assets as directed by this Court at the hearing to open this Bankruptcy.

Resp. to Mot. Summ. J. ¶¶ 9-13.

On the strength of the foregoing, the Plaintiff asked that the Debtor's Motion be denied and that instead she, the Plaintiff, be awarded summary judgment.

The Debtor filed a reply to the above paragraphs of the Plaintiff's pleading, as

follows:

9.      Denied as stated. The debtor, Ann Miller had no referral fee arrangements in place at the time of her bankruptcy filing on June 23, 2012. (Discovery conducted by Kenneth G. Harrison, Esquire, and Joan Zubras' civil case counsel, Howard Trubman, Esquire, as well, has confirmed through discovery propounded upon Ann Miller's co-counsel that she had no referral fees due, pending or prospective, literally none whatsoever, on June 23, 2012. Ann Miller had only contingent fee cases at the time of her bankruptcy filing. Strict proof is demanded.

10.      Denied. At her Meeting of Creditors held on July 26, 2012 the debtor disclosed that she had a new regular hourly billing client. This was not a job, this was independent contractor billing, which the debtor ran through her business as gross revenue. (*See* attached as Exhibit D1 the 2012 Federal Income tax return of the debtor, Ann Miller, showing gross business revenue of $87,947 on Schedule C, and adjusted gross income of $7,884.) This amount works out to a monthly income of only $657 for 2012. Strict proof is demanded.

11.      Denied. The debtor, Ann Miller, had no referral fee arrangements of any kind on June 23, 2012. (*See* attached as Exhibit D2 a letter from Todd S. Collins, Esquire of Berger & Montague, P.C. to Kenneth G. Harrison, Esq. dated September 24, 2015 clearly stating that the five (5) cases referenced within the herein offered affirmative defenses and which states that there are no referral fees due to Ann Miller.) Strict proof is demanded.

12.      Denied as stated. The referenced $23,423.00 is not a referral fee but a contingent fee. And further how would it have been possible in June, 2012 to predict a victory in this case let alone the amount of the attorney fee on a case that was still in active litigation and not determined until July, 2014. Strict proof is demanded.

13.      Denied. The Court did not direct the Debtor to amend her petition to include any assets. The debtor's position then was that her contingent fee cases were not assets of the estate and that remains her position. Strict proof is demanded.

Reply to Resp. ¶¶ 9-13.

A hearing on the cross motions was held November 25, 2015. At its conclusion the Court denied both Motions for the reasons placed on the record in open Court that day. Docket #11.

Earlier, on July 30, 2015, the Court had issued a Pretrial Order which scheduled trial for January 14, 2016. It also directed the parties to file a <u>Joint</u> Pretrial Statement on or before December 9, 2015. Docket #4. This seemingly non-controversial matter soon proved to be anything but. On December 14, 2015 counsel for Plaintiff filed a Pretrial Statement on her behalf only. Docket #13. In it he acknowledged that the document was not a <u>Joint</u> Pretrial Statement but attached an exhibit by way of explanation. Exhibit "A" was a letter dated December 9, 2015 from Plaintiff's counsel, Kenneth Harrison to Debtor's counsel Douglas Lally, with the following short text:

> Dear Mr. Lally:
>
> Enclosed please find a draft of the joint pre-trial statement in the above matter.
>
> If I do not receive a response from you by December 15, I will file it with the comment that you have not approved this statement.

Pl.'s Pretrial Statement Ex. A; Docket #13.

On December 18, 2015 the Debtor filed a Motion to Strike the Plaintiff's Pretrial Statement. The Debtor's position relative to this can be gleaned from her counsel's correspondence of December 10, 2015 to Plaintiff's counsel, as follows:

> Dear Mr. Harrison:
>
> I am in receipt of your cover letter with proposed Joint Pre-trial Statement dated December 9, 2015 and faxed to me later yesterday afternoon. According to the Court's PreTrial Order dated July 30, 2015 at Paragraph 5(G) your proposed Joint Pre-Trial

13

> Statement is untimely as you were required to submit a proposed
> joint pretrial statement to me as defendant's counsel not less than 7
> days prior to the filing deadline (i.e., initial presentation due on
> 12/2/15) as the deadline for both filing and submission to chambers
> of the signed Joint Pretrial statement was December 9, 2015.
> Finally, I will not condone to approving a tardy proposed Joint
> PreTrial Statement and furthermore do not agree with said
> document's representations. If you file any untimely alleged Joint
> PreTrial Statement I will in response file a Motion to Strike.

Mot. to Strike – Ex. 3; Advs. Docket #14.

The Plaintiff responded to the Motion to Strike on December 23, 2015. In the response, the Plaintiff argued that her Pretrial Statement adequately laid out the parties' competing positions, but suggested that the Debtor could file her own Pretrial Statement if she wanted.

A hearing on the Motion to Strike was held January 13, 2016. At its conclusion the Court granted the Motion to Strike for the reasons placed on the record at that time. The Court then directed the parties to file a Joint Pretrial Statement by January 27, 2016. This date came and went without the filing of a Joint Pretrial Statement. The Court thereupon scheduled a status conference for March 9, 2016. On March 4, 2016 the parties finally submitted a Joint Pretrial Statement. In addition to the central issues in the case, as hereinbefore described, the lengthy Joint Pretrial Statement set forth a plethora of additional issues raised by the Debtor, most all of which had to do with whether relief to the Plaintiff was barred because of her failure to strictly adhere to various and sundry rules of procedure during the pre-trial phase of the case.

The Court scheduled trial for June 9, 2016. The trial was continued but was ultimately held and concluded on August 31, 2016. The Court thereupon took the matter

under advisement, and now issues this opinion as its findings of fact and conclusions of

law.

### *Discussion*

At the outset, the Court considers it important to make clear that it considers

pre-trial procedures to be important. Generally speaking, they help the parties and the

Court better understand the dispute at hand and prepare for trial. They "streamline" the

adversarial process, so to speak, which normally results in efficiencies and economies

for all concerned. Unfortunately, that did not happen in this case. Nevertheless, and as

will be discussed *infra*, rigid adherence to formalistic procedures, in the absence of any

demonstrable prejudice attributable to a departure from them, raises a risk that the

important issues in a lawsuit will become obscured, possibly producing a miscarriage of

justice.

With this in mind, the Court will review the parties' competing contentions against

the evidentiary record they made.

In this regard the Court will analyze in turn:

I.      The Debtor's Failure to Schedule the Plaintiff as a Creditor;

II.     The alleged Non-Disclosure of Assets;

III.    The alleged Non-Reporting of Income;

IV.     Whether the Evidence Warrants Revocation of the Debtor's
        Discharge under 11 U.S.C. § 727(d); and

V.      Whether the Debtor should be denied a Bankruptcy Discharge
        under 11 U.S.C. § 727(a)(2) and/or (4).

### I.      Failure to Schedule the Plaintiff as a Creditor

There is no dispute that the Plaintiff was not a scheduled creditor in 2012. Why

she was not scheduled is another matter.

The parties brought to trial a tape recording of the § 341 creditors meeting held on August 1, 2012. Joint Exhibit #1. Both sides rely on it and both asked that it be played at the outset of the trial. The Court declined the request, but assured the parties that it would definitely listen to the tape, which it has, carefully, and in its entirety.

As hereinbefore noted, testimony offered at a creditors meeting is sworn testimony given under penalty of perjury. The Debtor took an oath to this effect at the very beginning of her creditors meeting. As pertains to inclusion of the Plaintiff as a prepetition creditor, the tape contains the following exchange:

> T: At the time you signed the petition did you review the petition and all the attached statements and schedules?
>
> AM: I did.
>
> T: Was all the information true and correct?
>
> AM: Yes.
>
> T: Were there any changes or modifications since then?
>
> AM: I think we were gonna add
>
> ATTY: There is one creditor
>
> AM: we forgot to add
>
> T: Okay
>
> AM: So we're gonna do that.
>
> T: And that's the only change?
>
> AM: Yup

Audio Recording § 341 meeting 8/1/2012.

Conversely, and as hereinbefore noted, in her <u>verified</u> Answer to the Plaintiff's Complaint, the Debtor later swore that the decision to omit the Plaintiff from her schedules was <u>intentional</u> and that her <u>sole</u> reason was fear.

16

In contrast to these two differing explanations, when asked about the very same fact by her counsel at trial, the Debtor had this to say about not scheduling the Debtor as a prepetition creditor:

> Q. You were asked if Ms. Zubras was listed on -- originally on your bankruptcy petition. Would you please tell us why Ms. Zubras was not listed on your bankruptcy petition?
>
> A. She asked not to be.
>
> Q. And -- and -- and in what context did she ask not to be?
>
> A. She wrote me a string of emails asking not to be listed.
>
> Q. And at -- subsequent to the filing of the bankruptcy, did you tell Ms. Zubras that you had filed bankruptcy?
>
> A. I did.
>
> Q. And when did you do that?
>
> A. Shortly after it was filed.
>
> Q. And do you remember when and where that was told -- where it was told to her?
>
> A. I told her about it because I was distressed that the bank that was foreclosing on the house had filed a summary judgment motion, and I told her that that had happened and that as -- I had filed bankruptcy in the hopes of slowing down the foreclosure.

Tr. 56:4 – 57:1.

Notably missing from the above trial testimony is any mention of either forgetfulness, or fear, as being the reason Miller did not schedule Zubras as a creditor. The Court reiterates however, that forgetfulness was the sole sworn explanation offered at the creditors meeting, and fear was the sole sworn explanation offered in the Debtor's July 23, 2015 Answer to the Plaintiff's Complaint. Attorney Lally revisited the subject with his client, but not before telling the Court, before his client did, that the Debtor was

also scared of Zubras and fearful of what might happened if she, the Debtor, did not

abide by Zubras' request not to be scheduled as a creditor in her bankruptcy.

Other than her own testimony, the only evidence offered by the Debtor in support

of her trial contention that she intentionally omitted scheduling the Plaintiff as a creditor

at the Plaintiff's own request was the referenced "string of emails," collectively admitted

at trial as Defense Exhibit 9. The Court will consider the Debtor's trial testimony and the

referenced emails in turn, followed by a consideration of the rebuttal evidence offered

by the Plaintiff.

### *The Debtor's Trial Testimony*

With respect to her testimony, the Court observes that with her trial testimony the

Debtor, a highly experienced attorney, had now provided three different <u>sworn</u>

explanations of her failure to schedule the Plaintiff as a creditor. Two of these came

scarcely one month apart.

To recapitulate, in 2012 the Debtor told the Trustee, under oath, that "we" <u>forgot</u>

to list the Plaintiff. (Her counsel at her side said nothing to contradict this.) As also

discussed, in her verified Answer to the Plaintiff's Complaint (July 23, 2015) the Debtor

averred that she had not scheduled the Plaintiff out of <u>fear</u>. Finally, on August 31, 2015,

at trial, the Debtor testified under oath not only that she intentionally omitted scheduling

the Plaintiff at the Plaintiff's own request, but that she had in fact told the Plaintiff of the

2012 bankruptcy shortly after it was filed. As to the latter point the Debtor was asked by

her counsel where and when the disclosure was made. As can be seen, the Debtor's

response was completely non-responsive. She failed to say where or when this critical

information was supposedly conveyed by her to the Plaintiff, alluding only to having told

the Plaintiff <u>why</u> she filed bankruptcy, which was said to be her distress over a foreclosure action.

It bears heavy emphasis that the Debtor's testimony at trial was the <u>first</u> time she had contended that she personally had told the Plaintiff of her 2012 bankruptcy case in 2012. This stunning assertion is nowhere to be found in any prior pleading or any prior testimony.[5]

Debtor's counsel stated at trial that he did not know the Debtor owed money to the Plaintiff at the time the 2012 bankruptcy was filed. Presumably, therefore, it had not come up in conversation between the Debtor and her counsel before the bankruptcy petition was filed. Tr. at 61:16 – 62:12. This strikes the Court as unlikely, or at least hardly accidental, given that the Debtor had a relatively small number of creditors, of which the Plaintiff was the largest, and given that the Debtor and counsel had stressed that it was Zubras who had referred Miller to Lally. Regardless, Debtor's counsel certainly knew of the debt by the time of the August 1, 2012 creditors meeting when the Debtor, with her counsel's acquiescence, told the Chapter 7 Trustee that "we forgot" to schedule the Plaintiff. The Court notes that despite their concurrent assurance to the Trustee that the oversight would be remedied, that happened only after the bankruptcy case was reopened.

Leaving this aside, what matters most is that by this time the Debtor had now given three inconsistent explanations of her failure to schedule Zubras as a creditor. Clearly, the Debtor's contradictory sworn testimony cannot be reconciled; not that any attempt was made to do so. Unquestionably, she perjured herself on one or more

---

[5] The Court notes that the issue is mentioned as a fact in dispute in the parties' March, 2016 Joint Pretrial Statement, but that alters nothing insofar as the Debtor's sworn testimony goes.

occasions. Her counsel may have been complicit in the Debtor's misconduct. Sadly, the evidence here and elsewhere tends to suggest so. That aside, the Debtor's prevarications were so readily apparent that the Court at one point became concerned that the Debtor, who seemed oblivious or indifferent to the glaring inconsistencies in her story, might in some way be impaired. Accordingly, the Court inquired as to whether the Debtor was under any medication that would impair her ability to understand the questions she was being asked and answer them truthfully. Tr. at 61:7 – 61:15. She stated that she was not.

The Court notes parenthetically that in a post-trial Memorandum of Law, Debtor's counsel has charged that by way of this inquiry, the Court accused the Debtor of using or being on drugs. As to that, the Court is satisfied that both the context and the transcript of the exchange speak for themselves.

In conclusion, the Court discredits the Debtor's trial testimony on this issue in its entirety. As noted, in all there were three separate and inconsistent sworn accounts given by the Debtor as to why she failed to schedule the Plaintiff as a creditor. In stark contrast, there was no acknowledgement of that fact by the Debtor, or her counsel, let alone any attempt by either of them to explain or reconcile the three incompatible sworn statements.

### *April 19, 2011 Emails*

Turning to the referenced "string of emails" (Defense Ex. 9), the Court notes initially that the emails total seven in number; six being from Zubras to Miller, and one being from Miller to Zubras. This correspondence was all sent and received on a single day more than 14 months prior to when the Debtor actually filed bankruptcy. It is the

Debtor's contention that the Plaintiff's six emails on April 19, 2011 represent a request by Zubras that she <u>not</u> be scheduled as a creditor in the 2012 bankruptcy. The Court does not agree.

Having reviewed the emails, it is the Court's opinion that the Zubras-to-Miller emails represent communications from an exasperated, highly distraught Zubras, who recognized only too well that if Miller were to file a bankruptcy the debt owed to Zubras could be discharged. The fairest reading of the emails is that Zubras was imploring Miller <u>not</u> to file a bankruptcy and wipe out the monies owed to her. One could also certainly infer from the emails that Zubras was asking Miller to pay her back before filing any bankruptcy. Just as clearly, however, the emails do not contain a request by Zubras that she not be scheduled as a creditor if Miller filed bankruptcy before repaying her.

Perhaps the most telling of the April 19, 2011 emails is the last of them, which was the only one sent by Miller to Zubras. Apart from demonstrating some familiarity with various nuances of bankruptcy law, Miller states that she was not contemplating bankruptcy, but that someone could possibly place her in bankruptcy. The email from Miller essentially confirms to Zubras that she, Zubras, was basically right to harbor the fears that were causing her distress, because being forced into a bankruptcy would cause Miller stress too. As Miller writes "Bankruptcy is what it is …" Miller assures Zubras, however, that it is her plan to pay her debts from her case proceeds. Miller ends by berating Zubras for both soliciting a "preference payment" and otherwise abusing her.

The Court considers the April 19, 2011 emails to have little probative weight if, for no other reason, than the "string," as it has been described, all took place on one single

day far removed in time from the Debtor's June, 2012 bankruptcy filing. Mainly, though,

the "string" simply fails to contain the request the Debtor claims.

In discrediting the Debtor's testimony on the issue of failing to schedule the

Plaintiff as a creditor, the Court has given due regard to factors traditionally employed to

assess witness credibility. In *F. Lee Bailey v. United States,* 54 Fed Cl. 459 (2002), the

Court of Federal Claims described the evaluation process in a helpful way:

> With regard to determining credibility, "[t]he factors to be
> considered in evaluating the testimony of a witness are
> perception, memory, and narration.... Sometimes a fourth is
> added, sincerity, but in fact it seems merely to be an aspect
> of the three already mentioned.... The demeanor of the
> witness traditionally has been believed to furnish trier and
> opponent with valuable clues." Fed.R.Evid. art. VIII, Advisory
> Committee (Introductory Note) (citing *Universal Camera
> Corp. v. NLRB,* 340 U.S. 474, 495–96, 71 S.Ct. 456, 95
> L.Ed. 456 (1951)) (balance of citations to texts omitted).
> Similarly, the United States Court of Appeals for the Third
> Circuit has stated that:

> Demeanor is of the utmost importance in the determination
> of the credibility of a witness. The innumerable telltale
> indications which fall from a witness during the course of his
> examination are often much more of an indication to judge or
> jury of his credibility and the reliability of his evidence than is
> the literal meaning of his words. Even beyond the precise
> words themselves lies the unexpressed indication of his
> alignment with one side or the other in the trial. It is indeed
> rarely that a cross-examiner succeeds in compelling a
> witness to retract testimony which is harmful to his client, but
> it is not infrequently that he leads a hostile witness to reveal
> by his demeanor—his tone of voice, the evidence of fear
> which grips him at the height of cross-examination, or even
> his defiance—that his evidence is not to be accepted as true,
> either because of partiality or overzealousness or
> inaccuracy, as well as outright untruthfulness. The demeanor
> of a witness, as Judge Frank said, is "wordless language."
> *Broadcast Music Inc. v. Havana Madrid Restaurant Corp.,*
> 175 F.2d 77, 80 (2d Cir.1949). It is in recognition of the
> superior advantage which observation of the demeanor of
> the witness confers on the fact finder that a reviewing court
> must accept as true whatever evidence supports the verdict

> of a jury and that in trials without a jury Rule 52(a) of the
> Federal Rules of Civil Procedure provides: "Findings of fact
> shall not be set aside unless clearly erroneous, and due
> regard shall be given to the opportunity of the trial court to
> judge of the credibility of the witnesses." *462 Government of
> the Virgin Islands v. Aquino, 378 F.2d 540, 548 (3rd
> Cir.1967)

*F. Lee Bailey v. United States,* 54 Fed Cl. at 461-62.

In this case, certain factors regarding the Debtor's credibility stand out. First, having listened to the tape of the Debtor's § 341 meeting in its entirety, the Court was struck by the Debtor's casual tone in discussing a matter (bankruptcy) which she had said would cause her enormous distress. In at least two separate places the Debtor can be heard chuckling as she responded to the Trustee's questions. Second, the Court was struck by the total nonchalance with which the Debtor proceeded to give the first of her conflicting sworn statements about scheduling Zubras. Added to this were a multitude of evasive, implausible, inconsistent, and argumentative responses by the Debtor to trial questions which went directly to important issues in the case. The trial transcript is replete with examples:

1.  Tr. 9:15 – 10:7

2.  Tr. 11:15 – 16:11

3.  Tr. 16:18 – 19:18

4.  Tr. 21:15 – 23:20

5.  Tr. 24:3 – 24:21

6.  Compare Tr. 11:5 – 11:8 with 24:22 – 26:4

7.  Tr. 29:23 – 33:22

8.  Tr. 34:25 – 35:17 / 36:13 – 36:15

9.  Tr. 38:3 – 40:22

10. Tr. 50:3 – 50:15

There are many other examples in the trial transcript, some will be discussed, *infra,* but the foregoing serve to make the point for now.

Adding to an already problematic credibility issue was a baffling degree of what seemed like an indifference on the part of the Debtor relative to the circumstances. This could be discerned not only through actions she took or did not take at various times in her case, but also through both her belligerent language and inflection at trial.

For example, the Court notes that the contents of the Debtor's Schedules and Statement of Financial Affairs were central to issues in the case, yet the Debtor dismissively admitted to not having even looked at them since they were filed. Tr. 9:14 – 9:20. The tape recording of the creditors meeting, meanwhile went to the heart of the Debtor's defense on the issue of her undisclosed class action cases, yet the Debtor initially claimed not to remember what was on the tape. Tr. 16:5 – 16:6. Indeed, she indignantly stated that she had neither listened to, nor reviewed the tape, possibly not at all since the creditors meeting, but definitely not within the preceding six months. Tr. 24:14 – 24:21. Her counsel confirmed that the Debtor had not come to his office to listen to the tape, and surprisingly, that he himself had not listened to the tape in over a year. Tr. 54:2 – 54:11.

Standing alone, the credibility gap is damaging, but it is made worse when coupled with the Debtor's shifting sworn testimony. To reiterate, when asked about the tape recording by Plaintiff's counsel, the Debtor immediately stated categorically that she could remember nothing about it. However, when questioned about the tape by her own counsel, only minutes later, the Debtor, without hesitation, testified that she

recalled her conversation with the Trustee at the creditors meeting and then described it. Tr. 53:13 – 54:16. This testimony was so dissembling that it was difficult to comprehend that it was being offered by an accomplished attorney with over 35 years of experience. The Court is constrained to add that the Debtor had an inexplicably smug attitude for one so clearly in the wrong.

### *Rebuttal Evidence*

Further compounding matters for the Debtor was substantial rebuttal evidence offered with respect to the Debtor's testimony.

First called was the Plaintiff's State Court counsel Howard K. Trubman, Esq. He confirmed that he indeed represented Zubras in a collection action against Miller and her entity, Ann Miller, LLC. He testified that he had known both Zubras and Miller for over 40 years. He knew that the two were friends and that after Zubras asked him to represent her he phoned Miller and asked her to have dinner with him, so that maybe the matter could be resolved. It is unclear from the record whether a dinner ever occurred, however Trubman's <u>unrebutted</u> testimony was that Miller told him that she was going to give Zubras "a hard way to go," and that she was going to "fight it tooth and nail." He added that Miller unequivocally did not mention that she had filed a bankruptcy. Tr. 79:8 – 79:19.

Trubman testified that he was shocked to learn of the bankruptcy on his receipt of the Answer and New Matter filed in State Court by attorney Lally. He testified that he conveyed the information to Zubras in a subsequent telephone call and that she took the news very hard. ("I didn't see her face but she sounded like she was going to have a stroke.") Tr. 80:19 – 80:20. Trubman stated that Zubras was shocked, dismayed and felt

betrayed. Trubman testified that knowing Zubras so well he was absolutely certain that she had no prior knowledge of Miller's 2012 bankruptcy case. This testimony, as indeed all of Trubman's testimony, was unrebutted. Trubman was a very believable witness and the Court credits his testimony in all respects.

The Plaintiff testified next. Zubras, who is also an attorney, described Miller as a close friend, probably her first adult friend after law school. Describing the friendship in greater detail, Zubras testified that she and Miller traveled around the world together; that she had sat next to Miller at her (Miller's) father's funeral; that she, Zubras, was with Miller until moments before Miller's mother died; that she, Zubras, had gone with Milller when it came time to euthanize two of Miller's beloved dogs; and that the two had shared with each other the ups and downs of their lives. Tr. 84:25 – 85:8.

All of this detail went unrebutted. Counsel chose not to cross-examine Zubras as to her friendship with Miller or, for that matter, any other aspect of her testimony. However, insofar as a friendship with Zubras is concerned, Miller earlier had had this to say:

> Q.   Now, Ms. -- changing gears a little bit, prior to filing your bankruptcy, Ms. Zubras and you were friends, correct?
>
> A.  Looking back, no.
>
> Q.  Well, at that time, yes?
>
> A. No.
>
> Q.  But she helped you get your job at SEPTA; did she not? Yes or no?
>
> A.  No.

Tr. 46:13 – 46:21.

The above exchange, along with other attempts by the Debtor to distance herself from having had a close friendship with Zubras over the years, was disingenuous in the extreme. For example, with respect to the Debtor's contract work with SEPTA, the Plaintiff testified, as follows:

> Q. In fact, did you help her get a job?
>
> A. Yes, I did.
>
> Q. And where?
>
> A. At SEPTA. I had tried -- there had been a shake-up in our legal department, and I tried once, and I was successful the second time.
>
> Q. Maybe give a little background for the judge as -- did you work at SEPTA?
>
> A. Yes. And during the change in management, my position was elevated, and so I was aware of openings in the legal department.
>
> Q. Um-hmm.
>
> A. And there was some openings for contract employees in, like, September of '11 (sic). And that really didn't suit her, but then another opportunity came up in, I think, May. She sent me her resume again, and I forwarded it, and I had (indiscernible), we hired her, and she started work in a couple of weeks.

Tr. 85:9 – 86:2.

According to Miller, none of this happened. In sharp contrast to the Plaintiff's detailed testimony on this issue, Miller's testimony was a categorical, unadorned denial of any help from Zubras.

The Debtor's sparse testimony rings hollow as contrasted with the details furnished by both Attorney Trubman and the Plaintiff. At bottom, the Court credits completely Zubas' testimony that she had no knowledge of Miller's bankruptcy prior to learning of it from Trubman. On this score, Zubras testified, as follows:

Q. Now, Ms. Miller filed bankruptcy on June 23, 2012. Prior -- prior to that date, did you and her ever discuss a bankruptcy filing?

A. Well –

Q. Or (indiscernible), I should say.

A. I'm sorry.

Yes, we did. In April or March of '11, she was supposed to pay me back money, and she wouldn't return my calls. I went there. And I had then sent her an email. I couldn't think of any other reason she'd be filing -- or, you know, giving me back money, because she had just gotten a settlement. And in September '11, we had discussed bankruptcy, and she said she did not want to file bankruptcy, that wasn't her intent, I was being hysterical, and that she wouldn't file for a bankruptcy because she had assets. She did not want to disclose her class cases because she knew that she had assets.

Q. All right. Now, when she filed the bankruptcy on June 23, 2012, did she inform you personally of the bankruptcy filing?

A. No. The first time I found out was when Howard told me.

Q. Okay. Now, did you receive any notices from Mr. Lally, her bankruptcy attorney, about the bankruptcy filing back in June or July of 2012?

A. No. And, in fact, I actually called Mr. Lally about her filing a tolling agreement, and he did not tell me she had filed for bankruptcy. He said he didn't realize what a good friend I had been, and he couldn't understand why she wouldn't file the agreement. And he said that he wouldn't represent her because he didn't represent people who screwed their friends.

Q. Okay. We'll get -- we'll get to the tolling agreement in a little bit.

A. Okay.

MR. LALLY: I didn't say the last part.

BY MR. HARRISON:

Q. Did you ever receive notice of the bankruptcy court filing from the bankruptcy court by mail or otherwise?

A. The only filings I received from the bankruptcy court were after I filed this petition, and then I did receive notices.

Q. And Ms. Miller knew where you lived, correct?

> A. Not only did she know where I lived, but we saw each other up --
> you know, weekly. I made dinner for her. We cooked together. We
> grilled out. We watched movies. She works at SEPTA, so I saw her
> when she was there. So we saw each other on a -- I'd say a weekly
> basis.

Tr. 90:13 – 92:15.

The Court repeats that Miller, despite having full opportunity to do so, posed few questions to Trubman and no questions to Zubras. The Court further emphasizes that despite also having full opportunity to do so, the Debtor offered absolutely no evidence of her own to counter the detailed testimony of either witness.

This brings matters around to the Debtor's contention that, regardless of the reason, the failure to schedule the Plaintiff as a creditor in 2012 was meaningless because Zubras was not damaged by it, or, as her counsel put it, "no harm, so no foul." This idiomatic expression derives from the game of basketball. Its use here is singularly inappropriate. A bankruptcy case is not a game. Furthermore, there was substantial evidence of the harm occasioned by Miller's many lies. As will be discussed, *infra*, unawareness of the 2012 bankruptcy obviously lulled Zubras into loaning more money to her close friend Miller. Harm also extended to Miller's other creditors. As to that, Miller's concealment of assets and non-disclosure of income enabled her to abuse provisions of the Bankruptcy Code which would have required her to propose a Chapter 13 Plan and repay some, if not all, of her debts. Before turning to this, however, a few observations about Miller's legal position are in order.

The crux of this defense centers on the fact that Miller's bankruptcy had been administered as a no-asset Chapter 7 case. In this regard, Miller relies on the decision of the Third Circuit Court of Appeals in *Judd v. Wolfe*, 78 F.3d 110 (3d Cir. 1996). In *Judd*, a Chapter 7 debtor sought to reopen her case to amend her schedules and add

an omitted pre-petition creditor. Like Miller, the *Judd* bankruptcy had been administered as a no-asset Chapter 7 case.

The Circuit Court held that it was not an abuse of discretion for the debtor's request to have been denied, because an unintentional tort claim is automatically discharged by operation of law under 11 U.S.C. § 727(b), even, said the Court, if the debtor intentionally omits scheduling the creditor in question. On the other hand, said the Court, if the debt in question stemmed from an intentional tort of the sort described in 11 U.S.C. § 523(a)(2),(4) or (6), then the unscheduled debt would not be automatically discharged, and the affected creditor would retain the right to litigate the issue and secure an adjudication as to dischargeability.

*Judd v. Wolfe* is certainly implicated in this case. Like the *Judd* case, this case involves the failure to list a creditor and the attendant consequences. However, rather than supporting Miller, the *Judd* case supports Zubras. The Plaintiff's Complaint expressly recites that her unawareness of the 2012 case prevented her from filing a Complaint objecting to discharge, which is the exception to the general dischargeability rule articulated in *Judd.* Indeed, the preserved right to contest dischargeability is precisely what the Plaintiff is exercising herein. To be sure, the Plaintiff is required to establish the elements of the causes of action she has pled, and as to that she bears the burden of proof. However, rather than precluding Zubras this right, *Judd v. Wolfe* guarantees it.

That said, the Court reiterates that its ruling in this case does not rest on a § 523 "exception to discharge" analysis. To the contrary, and as discussed *infra*, the egregious circumstances of this case warrant revocation and denial of discharge under Bankruptcy

Code § 727. As noted at the outset, this disposition renders separate evaluation of the Plaintiff's § 523 claim moot.

In this regard, the Court notes but dismisses the Debtor's argument that the Court cannot consider anything in this case <u>but</u> a § 523 claim. The Debtor argues that in the parties' Joint Pretrial Statement the relief requested by the Plaintiff at ¶ IV is that Miller's debt to her be declared non-dischargeable. Miller claims that this takes conduct that might implicate denial of a discharge under 11 U.S.C. § 727 off the table.

This argument fails for several reasons. First, an adverse ruling against the Debtor under 11 U.S.C. § 727 would secure to Plaintiff the very relief described. Second, the issues of revocation of discharge and denial of a discharge under § 727 are <u>expressly</u> joined in the Plaintiff's Complaint and the Defendant's Answer. Further, in the parties' Joint Pretrial Statement each side <u>expressly</u> included the Debtor's entitlement to a discharge under 11 U.S.C. § 727 as a legal issue presented. Further still, F.R.C.P. 15 allows a party to move at any time to conform the pleadings to the proof at trial and directs the Court to freely give leave to such requests when justice so requires. Not that F.R.C.P. 15 is genuinely implicated here, given the Complaint, Answer and Joint Pretrial Statement. Finally, even if dischargeability under 11 U.S.C. § 727 had not been expressly pled, which it clearly was, it would not matter since the issue was tried by consent and without objection, the Debtor's belated challenge to that reality notwithstanding.

Further to the latter point, and although the Court considers the issue to be inapposite, even if express consent to trial of the Plaintiff's 11 U.S.C. § 727 claims did not exist by virtue of the pleadings described. The record clearly supports even the

more difficult finding of implied consent. A finding of implied consent depends on three

factors: 1) whether the parties recognized that the unpleaded issue entered the case at

trial 2) whether the evidence that supports the unpleaded issue was introduced at trial

without objection, and 3) whether a finding of trial by consent prejudiced the opposing

parties' opportunity to respond. *Liberty Lincoln – Mercury, Inc. v. Ford Motor Co.,* 676

F.3d 318, 327 (3d. Cir. 2012) (quoting *Douglas v. Owens,* 50 F.3d 1226, 1236 (3d Cir.

1995). The requisite elements are all present here. In the first place, the foregoing

discussion of the required elements of implied consent concerns an <u>unpleaded</u> issue.

Here, as noted, the issue of the Debtor's right to discharge was <u>expressly</u> pled in the

Complaint and responded to in the Debtor's Answer; it was also <u>expressly</u> stated by

both parties to be a legal issue for determination at trial. Against this backdrop the Court

finds the Debtor's contention of an "ambush" to be specious. Indeed, the Debtor brought

to Court and introduced at trial evidence she hoped would refute a § 727 challenge to

her entitlement to a discharge. In short, and contrary to the Debtor's claim, there was no

surprise, no prejudice, and no manifest injustice, even if the Court's inquiry were

required to extend this far, which it is not.

## II.    <u>Undisclosed Assets</u>

The Court turns next to the question of undisclosed assets, specifically Miller's

class action cases. Miller contends that the cases did not need to be included on her

bankruptcy schedules because, as a matter of law, they were not part of her bankruptcy

estate. The Debtor fails, however, to cite <u>any</u> case that supports that proposition and the

Court has found none. There are, on the other hand, numerous cases which expressly

hold to the contrary. For example:

> The filing of a Chapter 7 petition creates a bankruptcy estate. 11 U.S.C. § 541(a)(1). Property of the estate includes "all legal or equitable interests ... in property" held by the debtor "as of commencement of the case." *Id.* The phrase "legal or equitable interests" in property is broadly interpreted to include "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative." *In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993) (citation omitted). While § 541(a) provides what interests of the debtor become property of the estate, state law determines the existence and scope of the debtor's interest in a particular asset as of commencement of the case. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law."); *McCarthy, Johnson & Miller v. N. Bay Plumbing, Inc. (In re Pettit),* 217 F.3d 1072, 1078 (9th Cir.2000).
>
> Attorney-debtors have an interest in fees attributable to prepetition legal services rendered under a contingent fee contract even if the contingency occurs after the filing of their bankruptcy petition. *E.g., In re Carlson,* 263 F.3d 748, 750 (7th Cir.2001)(Posner, J.); *Jess v. Carey (In re Jess),* 169 F.3d 1204, 1207 (9th Cir.1999); *In re Avery,* 947 F.2d at 774. Section 541(a) is written broadly to include "contingent future payments that were subject to a condition precedent on the date of bankruptcy." *In re Bagen,* 186 B.R. 824, 829 Bankr.S.D.N.Y.1995) (citing *\*744* H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76 (1977)), *aff'd,* 201 B.R. 642 (S.D.N.Y.1996). The fundamental question is whether the debtor-attorney had any legal or equitable interest in the potential contingent fee at the time of petition. § 541(a). As Judge Posner noted in *In re Carlson,* a debtor-attorney has a "legally enforceable interest in a potential contingent fee ... [because] if the client terminates his employment before judgment or settlement ... and so before the lawyer receives any fee, he is entitled to the fair value of the services that he performed up to the termination." 263 F.3d at 750 (citations omitted). Although he was applying Illinois law, Judge Posner employed an important hypothetical legal fiction: Whether the contingent-fee attorney would be entitled to any compensation for services rendered if he were terminated before the contingent event occurs. If so, the fee attributable to those "pre-termination" legal services is property of the estate. *Id.* at 750. Many other courts also analogize the bankruptcy petition date as a hypothetical termination date. *See, e.g., In re Avery,* 947 F.2d at 774; *Tishgart v. Hoffman (In re*

> *Tishgart),*No. 09–13400, 2012 WL 5489034, at *8 (9th Cir. BAP
> Nov. 13, 2012).

In re Scotchel, 491 B.R. 739, 743-44 (Bankr. N.D.W.V. 2013).

Or, as another Court put it several years earlier:

> Those portions of [a debtor's] contingent attorney's fees which may
> be paid postpetition, *411 but were nevertheless earned and rooted
> in his prepetition past, should be includable in his bankruptcy
> estate. *In re Bagen,* 186 B.R. 824, 829 (Bankr. S.D.N.Y.
> 1995), *aff'd,* 201 B.R. 642, 643–44 (S.D.N.Y.1996) ("Under the new
> Bankruptcy Code, Congress intended property of the estate to
> include ... [the] debtor's contingent contract right to future
> payments").

> [T]he value of [a debtor's] services rendered pre-petition on his
> contingent fee contracts is property of the bankruptcy estate. *Watts
> v. Williams,* 154 B.R. 56, 58 (S.D.Tex.1993).

> As these decisions illustrate, "[t]he Bankruptcy Code intends to
> recognize economic realities, and the economic realities are that
> the work already done on open cases had an economic value at the
> time of the filing of the petition, notwithstanding that collection of the
> fee could be subject to defeasance for a vast number of reasons,
> including neglect to complete the work, discharge for cause, or just
> losing at trial." *Bagen, supra,* 201 B.R. at 644

In re Labrum & Doak, 227 B.R. 391, 411 (Bankr. E.D. Pa. 1998).

The Debtor ignores the foregoing authority.[6] The Debtor's legal position is that

the Bankruptcy schedules only require the Debtor to disclose assets that she "owns."

Her class action cases, says the Debtor, were owned by her clients and not by her,

thereby making them non-reportable. The only authority the Debtor cites in support of

her position is Rule 1.8(i) of the Pennsylvania Rules of Professional Conduct which,

---

[6] Going to this, the Court draws attention to Pennsylvania Rule of Professional Conduct 3.3 entitled
"Candor Toward the Tribunal." Paragraph (a)(2) thereof is implicated, as the above legal authority is
directly adverse to the Debtor's position. Debtor's counsel made no voluntary mention of the contrary
authority although he was required to have done so. With dismay the Court notes that Paragraph (a)(3) is
also implicated, given the Debtor's perjurious testimony. Debtor's counsel should clearly have alerted the
Court of the Debtor's inconsistent statements prior to trial and amended the pleadings containing them.
*See In re Engel,* 246 B.R. 784, 793 (Bankr. M.D. Pa. 2000).

subject to certain caveats, prohibits a lawyer from acquiring a proprietary interest in a

client's cause of action. The Rule in question reads as follows:

> (i) A lawyer shall not acquire a proprietary interest in a cause
> of action that the lawyer is conducting for a client, except
> that the lawyer may:
>  (1) acquire a lien authorized by law to secure the lawyer's
> fee or expenses; and
>  (2) contract with a client for a reasonable contingent fee in a
> civil case.

Pa R.P.C. 1.8(i).

Although Miller herself has repeatedly referred to her class action cases as

contingent fee cases, she contends that the above contingency fee exception does not

apply. She argues that her class action cases are not contingent fee agreements: first,

because the legal fee is to be paid solely by the defendant in the class-action case;

second, because the class action plaintiff has no obligation to pay the plaintiff's counsel;

and third, because the fee agreement does not provide for the percentage of the

recovery to be paid to counsel. These reasons are either irrelevant, incorrect, or both.

As to the first, to wit, that the legal fee is to be paid by the class-action defendant,

that has nothing to do with the contingent nature of the fee. The *source* of the fee does

not determine if it is contingent or guaranteed. What matters is that the fee is earned

only if the case is won or settled for a sum certain. A contingent fee has been defined

as:

> an agreement express, or implied, for legal services ... under
> which compensation, contingent in whole or in part upon the
> successful accomplishment or disposition of the subject
> matter of the agreement, is to be in an amount which either
> is fixed or is to be determined under a formula....

*Eckell v. Wilson*, 409 Pa. Super. 132, 138, 597 A.2d 696, 699 (1991).

This is exactly what the fee agreements collectively admitted as Plaintiff's Ex. P-5 provide. The Debtor's legal position borders on the absurd. Moreover, the Court here expresses its astonishment that, despite having herself adamantly insisted throughout this case that any monetary interest in her class action cases was not in the nature of a <u>referral</u> fee, but was instead a <u>contingent</u> fee, the Debtor now contends that even that is untrue.[7]

The Debtor's second argument; to wit, that the class-action plaintiff is not required to pay counsel's fee, is likewise without merit. If any fee is to be paid, it would come from the class-action defendant or from the class fund. *See* Ex. P-5. That does not negate the contingent nature of the fee arrangement.

Third, and lastly, while the fee agreements do not specify a percentage for attorney's fees, that is typical for class-action litigation. In such cases, the trial court awards attorney's fees upon review after verdict or settlement. The award of counsel fees may be a percentage of the total fund available to the class, or it may be based on a lodestar analysis. In either event it is the reason why class action fee agreements are often silent as to the precise percentage of any recovery the plaintiff's counsel will receive.

In short, none of the reasons given by the Debtor establish that the Debtor's fee agreements with her class action clients were not reportable contingent fee agreements. In fact, and to the contrary, they are paradigm examples of reportable contingent fee agreements. They all were most definitely required to have been reported in the Debtor's bankruptcy schedules. Specifically, each of her cases was required to have

---

[7] As to the Debtor's "Referral Fee" vs. "Contingent Fee" distinction, the Court views it as nothing more than a reliance on semantics to defend an otherwise indefensible legal position.

been disclosed as a contingent or unliquidated claim on Bankruptcy Schedule B.

The Debtor argues however that, even assuming *arguendo* that the cases were reportable, she must be exonerated for failing to report them because she revealed them to the Trustee at her § 341 creditors meeting. It will be recalled that on this score the Debtor has maintained that she "fully discussed and disclosed" her class action cases with the Trustee at the creditors meeting. This is a gross distortion of what transpired.

Following is the complete text of the dialogue on this issue from the creditors meeting:

> T: Do you have any like referral fees due to you? Or anything like that?
>
> AM: Uh no.
>
> T: Are there any assets of your firm or your practice?
>
> AM: Uh no, everything is um a contingent case so there's no fees that have been awarded yet.
>
> T: Do you have um active cases?
>
> AM: Oh yes.
>
> T: So there would be at least a quantum (undiscernible) with
>
> AM: Well um the clients, they're class action cases so it's not like I'm gonna probably collect anything from any of these uh you know class action plaintiffs if the case goes south. I mean if we don't win or settle uh
>
> T: And what kind of book of business is it?
>
> AM: Um let's see, I have one case that I'm in now that is against Dupont, it's the Imprelis litigation. That was a product they put out last year, and instead of killing your weeds it also killed your trees. So um, there's, I have, … you know, obviously I'm in that case. I have three cases that are stayed and have been for two years that are against title insurance companies – three different class actions here in Pennsylvania. The reason they got stayed is that there is

another case that is not ours has an issue in front of the
Pennsylvania Supreme Court and in their inimitable fashion, they
haven't ruled um ….it's actually gonna be … well the briefing is
over two years old in that case and the argument will in September
the15th will be the two year date for the oral argument. So those
have been sitting there. I have another case against a car leasing
company that has unfortunately, I mean we've even survived
summary judgment, but we're in front of a really slow judge and the
defendant is, I know you're shocked to hear this, is dragging its
feet. … And, uh I do have one case that's actually moving forward
fairly quickly in New Jersey which is against a title insurance
company.

T: So they're all class action cases?

AM: Yeah, they're all class action cases. I only recently have an
hourly billing matter that's made my life livable again.

Audio Recording § 341 meeting 8/1/2012.

At the outset the Court reiterates that it has listened to the tape of the creditors

meeting. During the course of the above brief exchange with the Trustee, the Debtor

can be heard chuckling on four separate occasions. The Court emphasizes this

because it factors into the Court's conclusion that rather than having a candid

discussion with the Trustee about her cases, the Debtor was clearly intent on

diminishing or completely dispelling in the Trustee's mind the idea that the cases had

any value. In that respect one might say the Debtor succeeded. The Debtor's exchange

with the Trustee was anything but a full discussion and disclosure. To the contrary, the

Court finds it to have been a contrived performance for a fraudulent purpose.

What the tape points to is that the Trustee decided against administering the

Debtor's Chapter 7 as an asset case because the Debtor had convinced him that her

contingent fee cases were basically worthless. Finally, as to the Debtor's claim that the

Trustee agreed with her that the cases were not bankruptcy estate property, as can

been seen from the above, the Trustee said no such thing.

In stark juxtaposition to the Debtor's statement that she was unlikely to collect

anything from her cases, evidence presented at trial conclusively established that at

least as early as July 19, 2012, well before the creditors meeting, the Debtor was

notified that she would be receiving her share of a fee from a class action case (KIA) in

the amount of $21,171. *See* Plaintiff's Ex. P-1. Apparently, the only reason the Debtor

had not already received the funds was because the bank account they were going to

be deposited into had been closed. *Id.* The Debtor made no mention of any of this at the

creditors meeting.

The Debtor was, however, questioned about the KIA payment at trial. She

admitted her post-bankruptcy receipt of the KIA fee, but claimed not to remember when

she received it. Yet evidence established that in a July 23, 2012 email to Zubras, asking

for cash, Miller stated that "the big check" had not yet cleared. Despite all of this the

Court notes that Debtor and counsel nevertheless listed receipt of this fee in the parties'

Joint Pretrial Statement as being among facts which were in dispute.

The Court discredits entirely the Debtor's testimony as to the $21,171 counsel

fee she received from the KIA class action. Her bankruptcy schedules were filed on July

17, 2012. On July 18, and July 19, 2012 she sent and received the emails, admitted as

Plaintiff's Ex. 1. The payment forthcoming to her is discussed in them. The Debtor

neither amended her schedules (filed only the preceding day) to include this

information, nor did she inform the Trustee of her impending receipt of this substantial

asset at the creditors meeting. In sum, the evidence is overwhelming that the Debtor

knowingly concealed information about the KIA payment with the intent to defraud the

Court, the Trustee and her creditors.

There was other evidence that contradicted the Debtor's downplay of her class

actions cases. Exhibit P-4 is a document entitled "Declaration in Support of Motion for

Attorney's Fees and Reimbursement of Expenses." It pertained to a class action case

filed in 2011 against the Dupont Company. It was commonly known as the "Imprelis"

litigation. In Exhibit P-4 Miller stated, under penalty of perjury, that from the inception of

the case to June 30, 2013, she had performed legal work in that case having a lodestar

value of $94,445.[8] A detailed description of the work is attached to the Declaration. On

February 12, 2013, roughly 7 months after the creditor's meeting, Miller sent an email to

Zubras the text of which read:

> Imprelis settlement preliminarily approved. If all goes well money at
> end of year.

Mot. to Reopen – Last Exhibit.

Miller ultimately received two separate payments from her representation in the

Imprelis case. The first being a payment of $9,916.47 (Tr.21:9), and the second being a

payment of $23,423. Tr. 22:13 – 22:18. Although the Debtor may have received less

than was requested, information pertaining to potential fee awards of the magnitude that

was sought can hardly be said to be so inconsequential as to be non-reportable. *See In

re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) *abrogated on other grounds*, 134 S.Ct.

1188 (explaining that every conceivable interest of the debtor, future, nonpossessory,

---

[8] The *Imprelis* Litigation was apparently transferred from the venue where it began (Pennsylvania, Middle District) to the District of Delaware. A document filed in the Delaware Court (Docket #189-1) lists the lodestar value of Miller's legal work through June 30, 2013 as actually being $222,859. *See* Motion to Reopen – Unnumbered Exhibit.

contingent, speculative and derivative is within the reach of § 541). More importantly, it was not the Debtor's prerogative to assess the abstract value or importance of her contingent class action cases. *See Parks v. Dittmar*, 618 F.3d 1199, 1205 (10th Cir. 2010) (stating that "the nature of a debtor's interest in property and whether it is legally cognizable is a different question than its valuation"). A debtor's obligation is to provide complete and accurate information. *See In re Kuhns*, 2011 WL 4713225, at *2 (Bankr.N.D.Ohio, Oct 7, 2011). Given that the fees were contingent, it goes without saying that a liquidated sum could not be set forth on the bankruptcy schedules. That hardly gives license, however, to altogether omit any reference to such assets.

To summarize, at the time of her bankruptcy filing the Debtor was class co-counsel in six pending cases. The law is clear that her interest in legal fees having to do with these cases was an asset required to be reported by her in her 2012 bankruptcy case. It was not. The Court finds that not only was the information fraudulently omitted from the Debtor's bankruptcy schedules, it was also grossly misrepresented, with fraudulent intent, at her creditors meeting. Before moving past this the Court notes that the record is unclear as to the ultimate disposition of all of the Debtor's class action cases. However, the record evidence as pertains to the KIA and Imprelis matters more than sufficiently establishes the Debtor's fraudulent conduct.

### III.   Unreported Income

The issue of unreported income relates mainly to income the Debtor received for legal work performed for SEPTA. As to this, the Debtor acknowledged that in 2012 she was an independent contract attorney for SEPTA and worked approximately 20 hours per week at the rate of $100 per hour. The Debtor concedes that this arrangement

began prior to her bankruptcy filing but testified that she had no idea how many checks she had received from SEPTA when she filed bankruptcy. Tr. 34:25 – 35:9.

Plaintiff's Exhibit P-6 sheds light on this. Secured by way of subpoena, the evidence established that the Debtor received $8,760 from SEPTA in June 2012 prior to her bankruptcy filing on June 23, 2012. The evidence was enormously detailed, including the exact dates the Debtor cashed her checks from SEPTA. Altogether, in calendar year 2012 the Debtor received a total of $62,320 from SEPTA. *See* Defense Exhibit 6 – 2012 Miscellaneous Income Form 1099. As reflected on Plaintiff's Exhibit P-6, the Debtor's 2012 SEPTA income came in uninterrupted weekly installments of roughly $2,000 per week. The payments continued well into the next year, with the Debtor receiving $102,700 between the date she filed bankruptcy in 2012 through September 2013.

There is no reference to SEPTA in the Debtor's Bankruptcy Schedules or SoFA. Joint Ex. 2 & 3. On Schedule I (Current Monthly Income) the Debtor described herself as being a self-employed lawyer for over 10 years. She listed three sources of income. First, estimated average and projected gross monthly wage income of $850; second, regular income from operation of a business of $800 per month; and third, monthly social security income of $1,786.[9]

Against her aggregate income on Schedule I the Debtor listed expenses on Schedule J of $3,903 per month. This produced a negative monthly income of $567.

---

[9] Although Schedule I directs the filing of a detailed statement in connection with regular business income, the Debtor attached no statement. Furthermore, Question #17 on Schedule I also required the Debtor to state whether any increase or decrease to her income was reasonably anticipated to occur within the year after the Schedule was filed. The Debtor omitted any reference to SEPTA and left Question #17 blank.

There are no business expenses listed on Schedule J. The expenses listed are all
ordinary household expenses. Supplementing Schedule I, and in response to SoFA
Question #1, the Debtor reported that, to the date her bankruptcy was commenced, her
2012 gross business income was $8,000. The business income stated on Schedule I
and SoFA answer are inconsistent, but not materially. Important instead is the fact that
the Debtor swore to the accuracy of this information in signing the documents. The
Debtor also swore to the accuracy of this information at the August 1, 2012 creditors
meeting. Finally, the Debtor swore to the accuracy of the income and expense
information in her verified Answer filed in Response to the Plaintiff's Complaint, and
once more at trial. These sworn assertions were convincingly shown to be false.

At trial the Debtor offered her 2012 Federal Income Tax Return. Ex. D-2. The tax
return was ostensibly offered to support the Debtor's contention that she had net
monthly income of only $657 for all of 2012. *See* Debtor Reply to Pl's Affirmative
Defenses in Summ. J. Mot. ¶ 10; *see also* Tr. 57:18 – 58:4.The Debtor maintains that
her bankruptcy schedules reflect her <u>net</u> business income after expenses. Clearly that is
not the case. Rather, it is altogether obvious that the Debtor once again fraudulently
portrayed the true facts. Even a cursory examination of the financial information she
provided confirms it to be materially false and irreconcilable in many respects.

Beginning with Schedule I (Current Monthly Income) the Debtor claims to have
had regular business income of $800 per month. As previously noted, the required
detailed statement backing up this figure was not provided. Nor, for that matter, were
there any regular monthly expenses from the operation of a business set forth in
response to Question #16 on Schedule J (Current Monthly Expenses). The Debtor

surprisingly explained this at one point by saying that she had no regular expenses from

the operation of a business at the time of her bankruptcy filing on June 23, 2012.

Debtor's Post Trial Mem. Law at ¶ 3. Specifically, the Debtor had this to say:

> 3. SCHEDULE J:
>
> Defendant debtor did not have any "Regular expenses from
> operation of business" (*See* Item 16 of Scheduled J) at the time of
> her filing on June 23, 2012. The Debtor had no office rent or other
> similar regular repetitive expense. Nothing concerning the
> existence of regular expenses was presented at trial by Plaintiff.

Def's Trial Mem. at ¶ 3.

In her aforementioned Reply to the Plaintiff's Response to the Debtor's Summary

Judgment Motion Debtor added the following:

> 10.  Denied. At her Meeting of Creditors held on July 26, 2012 the
> debtor disclosed that she had a new regular hourly billing client.
> This was not a job, this was independent contractor billing, which
> the debtor ran through her business as gross revenue. (*See*
> attached as Exhibit D1 the 2012 Federal Income tax return of the
> debtor, Ann Miller, showing gross business revenue of $87,947 on
> Schedule C, and adjusted gross income of $7,884.) This amount
> works out to a monthly income of only $657 for 2012.) Strict proof is
> demanded.

Def's Reply to Pl.'s New Matter and Countercl. for Summ. J. at ¶ 10.

In contrast to this, the Court notes that there is a $30,842 "net" profit reported on

the 2012 tax return for Ann Miller, LLC., and that this itself was in part a by-product of a

$10,438 non-cash deduction by the Debtor for the business use of her home. The Court

further notes that the Debtor's adjusted gross income was a by-product of a $25,193

non-cash deduction for a net operating loss carryforward. Adding back just these two

non-cash items raises the Debtor's adjusted gross income to $45,515. This translates

into a monthly income of almost $4,000 per month, which is a far cry from the $657 per

month the Debtor claims.

Apart from her tax return bearing no resemblance to the $800 net monthly

business income the Debtor swore to in her bankruptcy schedules, the Debtor's income

on those schedules cannot be squared with the amount she was paid by SEPTA. By the

time she filed bankruptcy the Debtor had already received over $8,000 from SEPTA.

The Debtor's 2012 earnings from SEPTA came to $63,320. The Debtor's SEPTA

earnings were paid to Ann Miller individually, not Ann Miller, LLC. Further, evidence at

trial established that against that income there were few, if any, offsetting expenses.

The Plaintiff testified credibly that SEPTA provided the Debtor with an office, a

paralegal, office supplies, access to on-line legal research sites, continuing legal

education tuition, and possibly also paid her Bar Association dues. Tr. 98:20 – 99:20. If,

as the evidence strongly suggests, the Debtor's gross income from SEPTA was very

close to her net income from SEPTA, it establishes beyond peradventure that the

Debtor's bankruptcy schedules were false when they were filed, that they should have

been amended but were not, and that the Debtor lied about all of it, first to the Trustee,

then in every pleading she filed, and finally at trial. Perhaps what is most troubling

though is that as bad as this looks, it is not the worst of the Debtor's problems.

To qualify for relief under Chapter 7 of the Bankruptcy Code, a debtor must

satisfy what is known as the "Means Test." Passed as part of the 2005 Bankruptcy

Reform Act, the Means Test was designed to ensure that individuals having the

wherewithal to make some payment on their debts via a Chapter 13 Plan would be

compelled to do so. The "test" requires completion of official Bankruptcy Form 22A. The

Debtor's completed Form was filed on July 16, 2012. Docket #23. The financial information provided there is <u>utterly</u> inconsistent with the information from the Debtor's 2012 tax return. In the means test calculation, again under oath, the Debtors states that the total <u>gross</u> monthly receipts of her business were just $1,000. Against this, she states that she had ordinary and necessary monthly business expenses of just $200.

The magnitude of the foregoing false oath is staggering. To recapitulate, in her 2012 tax return the Debtor, under penalty of perjury, reported average monthly gross receipts for her business of over $7,000. For purposes of the Means Test she swore it was $1,000 per month. In her 2012 tax return, under penalty of perjury, the Debtor reported average monthly business expenses of over $5,000 per month. For purposes of the Means Test she swore it was $200 per month.

The patently fraudulent information the Debtor swore to in completing the Means Test produced a false income figure which enabled her to avoid having a "presumption of abuse" characterization attach to her case. This, in turn, enabled her to avoid the scrutiny which would, without question, have required her to have proposed a Chapter 13 repayment plan, instead of securing relief under Chapter 7.

The sworn financial information furnished by the Debtor in connection with the Means Test produced an annualized income of $19,800. The "Test" compares that figure against the median annual income for a household of a similar size. The Debtor is single and has no dependents. In Pennsylvania, the median family income for a one person household in 2012 was $46,515. Because she reported an annual income far below this the Debtor passed the Means Test for Chapter 7 eligibility without further scrutiny. *See* 11 U.S.C. § 707 (b)(7).

The Debtor made no attempt to explain any of the foregoing discrepancies. Her silence in the face of such daunting evidence of perjury speaks volumes. Thus, as with the foregoing two issues examined, (i.e., unscheduled creditor and undisclosed assets) the Court finds the evidence to overwhelmingly establish that with the intent to defraud the Court, the Trustee, the Plaintiff and other creditors, Miller misrepresented, concealed, distorted and otherwise failed to disclose income in her 2012 bankruptcy case. Unfortunately for the Debtor, beyond conclusively demonstrating bankruptcy fraud, the foregoing evidence tended to establish that the Debtor also filed a fraudulent tax return.

As noted, the Plaintiff also claimed that the Debtor concealed income from the disposition of various and sundry items of personal property and that she may also have had a financial interest in assets belonging to her deceased mother. The Court will briefly address these issues because, while the evidence presented on these issues was clearly adverse to the Debtor, it is cumulative for present purposes.

Evidence established that the Debtor regularly placed clothing for sale with a consignment shop called Linda's Loft. Schedules of the income she received from July 2011 through September 2013 were introduced as Plaintiff's Exhibit 9.The Debtor testified that she could not recall if she sold items through Linda's Loft in 2011. Indeed, even after being handed P-9, the Debtor testified that she did not recognize anything on it. Tr. 44:12. She also stated that she stopped doing business with Linda's Loft before filing for bankruptcy. Tr. 46:6. Exhibit P-9 established the latter assertion to be false, while the former assertion was not credible.

Debtor's counsel likened her sales via Linda's Loft as akin to the liquidation of personal items, much as you would at a "garage sale." The Debtor concurred. Tr. 53:11. The Court notes, however, that the Debtor's sales through Linda's Loft from 2011 to the date of her bankruptcy filing in June 2012 exceeded $15,000. This hardly comports with a "garage sale" analogy. But that begs the question. Regardless of how the Debtor viewed these transactions, their magnitude was obviously such that they should have been disclosed in response to SoFA Question #2 or #10. As with her class action cases, it was not for the Debtor to calculate the significance of these transfers. It was her obligation to report them. Rounding matters out, the Court notes also that the Debtor's post-petition sales through Linda's Loft exceeded $2,200, although the Debtor valued the wearing apparel she owned on the date she filed bankruptcy at $500. Schedule B – Item #6. Finally, Apart from Linda's Loft, there was credible unrebutted testimony from the Plaintiff that apart from clothing the Debtor intermittently sold gold, silver and diamonds. Tr. 100:4.

The Debtor's late mother owned a condominium unit. It was scheduled for a tax sale and at trial the Debtor testified that it was sold at a tax sale "years ago." By agreement the documents relevant to this were made part of the record. They reflect, however, that the tax liens in question, which were filed on May 30, 2014 and June 25, 2015 were both marked satisfied on June 29, 2016, and that as of the time of trial the title to the condominium unit remained in the name of the Debtor's mother, Ruth Miller. The record is unclear as to the ultimate fate of the condominium unit, however once again the Debtor's testimony was shown to be false.

To recapitulate, none of the foregoing was helpful to the Debtor. Instead it served

only to again demonstrate the Debtor's proclivity for offering false or misleading

testimony under oath. Importantly though, it served to reinforce the Court's conviction

that the conclusions it has drawn with respect to fraudulent conduct on the part of the

Debtor are correct.

## IV.   Revocation of Discharge

Against this backdrop, the Court turns to the question of whether a revocation of

the Chapter 7 discharge Miller received on October 12, 2012 is called for.

In this regard the Bankruptcy Code provides that:

> (d) On request of the trustee, a creditor, or the United States
> trustee, and after notice and a hearing, the court shall revoke a
> discharge granted under subsection (a) of this section if--
>
>> (1) such discharge was obtained through the fraud of the
>> debtor, and the requesting party did not know of such fraud until
>> after the granting of such discharge;
>
>> (2) the debtor acquired property that is property of the
>> estate, or became entitled to acquire property that would be
>> property of the estate, and knowingly and fraudulently failed to
>> report the acquisition of or entitlement to such property, or to deliver
>> or surrender such property to the trustee;

11 U.S.C. § 727(d)(1) and (d)(2).

To have a discharge revoked, a creditor must show that but for the fraud, the

discharge would not have been granted. *In re Fellheimer*, 443 B.R. 355, 367

(Bankr.E.D.Pa. 2010). Further, the plaintiff must prove by a preponderance of the

evidence that the debtor procured the discharge through actual fraud, as opposed to

constructive fraud. *In re Cook*, 2012 WL 1073239, at *3 (Bankr.W.D.Pa., Mar. 29, 2012).

As concerns this, the three issues to be considered are those already discussed

at length, i.e., failure to schedule Zubras as a creditor; alleged concealment of assets;

and alleged non-disclosure of income. These issues have already been extensively

analyzed, *infra;* and the Court incorporates here its earlier discussion of the assets and

income Miller fraudulently concealed. As to her failure to have scheduled Zubras as a

creditor, the Court will briefly recapitulate the evidence adduced, along with its

implications, and add to this a few additional observations it considers noteworthy.

Much has already been written about Miller's failure to schedule Zubras. The

Court has fully discredited Miller's three conflicting explanations of this fact, (forgot to;

was afraid to; was asked not to) along with her incredible assertion that she actually told

Zubras of the 2012 case shortly after it was filed. As opposed to any of that, the

evidence, by well more than a preponderance, points to Miller's having not listed Zubras

because she wanted to conceal her class action cases and her SEPTA earnings, while

also continuing to borrow money from Zubras.

It will be recalled, on the latter score, that the evidence at trial confirmed that

Miller borrowed money from Zubras over a period of years. Exhibit P-14 is an undated

document which details 9 separate pre-petition loans totaling over $42,000. Zubras

testified that she typed the document, that Miller inserted the handwritten interlineations

describing the repayment terms, and that Miller signed the document in her presence.

For her part, Miller denies it all and claims that her signature is a forgery. Tr. 47:22 –

48:16. The Court dismisses this claim as another fabrication. The record contains a

multitude of documents signed by Miller. Her distinctive signature on Exhibit P-14 is

identical to others to the extent that they could almost be superimposed. The Court finds

this simply to be another striking example of transparently false testimony from Miller.

Approximately a month before filing the 2012 bankruptcy case, Miller borrowed

$2,500 from Zubras. *See* Exhibit P-11. The bankruptcy did not stop this pattern. Exhibit

P-12 is a collection of cashed checks representing 12 separate loans from Zubras to

Miller between January 2013 and June 2014 totaling over $3,300. At trial, Miller had this

to say about these loans:

> Q. And after you filed the bankruptcy, you asked Ms. Zubras for
> more money?
>
> A. I believe she did loan me money after the bankruptcy, a de
> minimis amount.

Tr. 48:13 – 48:16.

In her unrebutted testimony Zubras testified to other instances on which she

gave Miller cash, put funds into Miller's checking account, paid Miller's bills and bought

Miller groceries.

At some point Zubras apparently broached with Miller the idea of what Zubras

described at trial as a "tolling agreement." The record is unclear, but this may have had

to do with Pennsylvania's four year statute of limitations on collection actions. *See*

42 P.S. § 5525(a).

Zubras' testimony on this point, again unrebutted, was that Miller reluctantly

agreed to sign a tolling agreement but that she wanted to "run it by" attorney Lally.

Zubras testified that she, Zubras, called Lally about the tolling agreement, as follows:

> 11. No. And, in fact, I actually called Mr. Lally about her filing a
>     tolling agreement, and he did not tell me she had filed for
>     bankruptcy. He said he didn't realize what a good friend I had
>     been, and he couldn't understand why she wouldn't file the
>     agreement. And he said that he wouldn't represent her because
>     he didn't represent people who screwed their friends.

Tr. 91:15 – 91:22.

Attorney Lally did not contradict this, except, as follows:

      MR. LALLY: I didn't say the last part.

Tr. 92:1.

   Zubras emphatically asserted that she would not have continued loaning money to Miller had she known of her bankruptcy. Common sense heavily supports that testimony. Moreover, one has to ask why Miller would even have been discussing a tolling agreement with Zubras if, as she claimed, she told Zubras about her bankruptcy in 2012.

   If the Court belabors the omitted creditor issue, it does so in recognition of the fact that at least to some degree, albeit a small one, the evidence against Miller was circumstantial. In cases where intentional fraud is concerned, however, this is not uncommon. Few individuals admit to intentional fraud. Determining whether a debtor intends to defraud is a subjective inquiry. *Field vs. Mans*, 516 U.S. 59, 70-72, 116 S.Ct. 437, 444 (1995). Thus, it is frequently necessary for a plaintiff to prove actual intent to defraud by circumstantial evidence. *In re Giquinto*, 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008). That is why it is helpful to contrast the detailed unrebutted descriptions of the many events presented as part of the Plaintiff's case with the Debtor's terse, dismissive, and unconvincing version of the same events. Put differently, the Court considers it highly improbable that the Plaintiff, whose demeanor at trial appeared both earnest and poised, manufactured her story. In this respect, the Court again stresses that the Debtor challenged no part of the Plaintiff's evidence through cross-examination, and that at the conclusion of the Plaintiff's case the Debtor elected to present <u>no</u> case whatever on her own behalf. Rather, attorney Lally simply requested dismissal of the case "based on

insufficient evidence of any assets…" Tr. 109:23 – 110:1. The Court denied that Motion as having no merit.

To summarize: the Court concludes 1) that Miller intentionally failed to list Zubras as a creditor, 2) that she repeatedly lied under oath about it, 3) that her motives were to conceal her class action cases, to conceal her SEPTA earnings, to avoid having to file a Chapter 13 repayment plan and to ensure that the Zubras would continue to loan her money. Finally, the Court finds that the Debtor succeeded in all of these respects, perhaps most poignantly, however, in perpetuation of the fraud against Zubras, who unawares continued to loan money to Miller for years afterward. This record well warrants revocation of the Debtor's 2012 discharge.

## V.    Denial of Discharge

The Court next turns to a denial of discharge. In this regard, Bankruptcy Code 11 U.S.C. § 727(a) provides, as follows:

> (a) The court shall grant the debtor a discharge, unless—
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
>  (A) property of the debtor, within one year before the date of the filing of the petition; or
>
>  (B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727 (a)(2)(A) and (2)(B).

Alternatively, the Bankruptcy Code provides for a denial of discharge

where:

> (4) the debtor knowingly and fraudulently, in or in connection with
> the case--
>
>  (A) made a false oath or account;

11 U.S.C. § 727(a)(4)(A).

With respect to 11 U.S.C. § 727(a)(2), a plaintiff must establish three elements:

(1) a disposition of property, such as a transfer or concealment; (2) a subjective intent

on the debtor's part to hinder, delay or defraud one or more creditors or the bankruptcy

trustee through that disposition; and (3) that both the disposition and subjective intent

occurred either within the one-year period before the petition was filed or after it was

filed. *In re Luby,* 438 B.R. 817, 827 (Bankr.E.D.Pa. 2010). The plaintiff bears the burden

of proving these three requirements by a preponderance of the evidence. *See Grasso,*

537 B.R. 216, 221 (Bankr.E.D.Pa.2015).

As to 11 U.S.C. § 727(a)(4)(A), the following applies:

> To successfully challenge a debtor's discharge under § 727(a)(4)(A), a
> creditor must prove that: (1) the debtor made a false oath or statement, (2)
> the debtor knew the statement was false, (3) the debtor made the
> statement with the intent to deceive, and (4) the statement was material to
> the bankruptcy case. *In re Hatch,* 2009 WL 3208694 at *8 (Bankr.E.D.Pa.
> September 30, 2009) "Section 727(a)(4)(A) is designed to ensure that the
> debtor puts dependable information in the hands of those interested in the
> administration of the bankruptcy estate without the need for the trustee or
> a party in interest to engage in costly, exhaustive investigations to ferret
> out the truth concerning the Debtor's financial condition." *In re
> Giquinto,* 388 B.R. 152, 178 (Bankr.E.D.Pa.2008).

*In re Luby, supra*, 438 B.R. at 833.

Any false statement made in a bankruptcy petition, schedule, or statement of financial affairs constitutes a false oath within the meaning of 11 U.S.C. § 727(a)(4)(A). The section also applies to false statement made during court proceedings. *In re Spitko,* 357 B.R. 272, 312 (Bankr. E.D. Pa. 2006).

The Court's evaluation of whether the Plaintiff has satisfied the requirements described above is aided greatly by what has gone before. That is to say that in this case the evidence that serves to justify the revocation of the Debtor's 2012 discharge under 11 U.S.C. § 727(d) likewise establishes the elements necessary to deny her a Chapter 7 discharge under 11 U.S.C. § 727(a)(2) and (a)(4). On this score the Court need not repeat its lengthy analysis, but instead incorporates it here. The Court refers the reader, in particular, to its earlier discussion of: 1) the Debtor's voluminous false testimony under oath; 2) the assets and income concealed by her; 3) the information withheld by her from the Plaintiff, the Trustee and the Court; 4) her intentions in engaging in the fraudulent conduct which the record evidence overwhelmingly established; the justifiable reliance parties placed on her falsehoods, misrepresentations, and non-disclosures; and the harm occasioned thereby. Denial of a discharge is clearly warranted in this case.

In reaching this conclusion the Court acknowledges that denial of a discharge is a harsh sanction, and that the requisite elements are to be strictly construed against the Plaintiff creditor and liberally in favor of the Debtor. *In re Gioioso*, 979 F.2d 956, 962 (3rd Cir. 1992). The Court is familiar with this directive. Nevertheless courts have always acknowledged, too, that a discharge in bankruptcy is a privilege, not a right, and should inure only to the benefit of the honest debtor. *In re Spitko*, *supra,* 357 B.R. at 297.

Where a Debtor is shown to have been dishonest with the Court and her creditors it may be appropriate to deny the debtor a discharge notwithstanding the "fresh start" policy of federal bankruptcy law. This is clearly such a case. The Debtor's fraudulent conduct was immense and pervasive, not only before and during her 2012 case, but afterward as well. Indeed, it has continued right through to the conclusion of the proceedings held herein.

Because of this and by Order of even date herewith, the Debtor's 2012 discharge will be revoked and the Debtor will be denied a discharge under 11 U.S.C. § 727(a)(2) and (4). Further, given the egregious misconduct which has been established herein, and the fact that it involves a member of the bar of the Commonwealth of Pennsylvania, a copy of this Opinion and accompanying Order will be concurrently transmitted to the Office of the Disciplinary Board of the Supreme Court of Pennsylvania.

An appropriate Order follows.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:  December 8, 2016